*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CO-1032

JEFFREY J. RICE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2006-CF1-013988)

(Neal E. Kravitz, *Judge*)

(Argued June 9, 2026                    Decided August 13, 2026)

*Adam G. Thompson*, with whom *Jaclyn S. Frankfurt* and *Daniel Gonen* were on the briefs, for appellant.

*Paige Lehman*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Colemen*, and *Christopher Macomber*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, DEAHL and HOWARD, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Jeffrey Rice appeals the Superior Court's order granting in part a motion to reduce his sentence under the Incarceration Reduction Amendment Act (IRAA), D.C. Code § 24-403.03. At the

time he filed his motion, Mr. Rice had served approximately eighteen years of his fifty-two-year sentence for a series of armed robberies committed over a four-week period in 2006, which culminated in second-degree murder, when Mr. Rice was twenty-two years old. After reviewing Mr. Rice's information under the eleven IRAA factors, the court found that Mr. Rice had demonstrated his current non-dangerousness and was entitled to a fifteen-year reduction of his sentence under the IRAA but that the interests of justice did not weigh in favor of his immediate release. D.C. Code § 24-403.03(c). Mr. Rice now appeals the court's denial of his request for immediate release, primarily arguing that the court improperly relied on a potential sentencing disparity with a codefendant and the sufficiency of his sentence vis-à-vis the codefendant in considering whether the interests of justice supported his immediate release.[1]

We hold that the motions court did not abuse its discretion in considering codefendant disparity and that any error in considering the sufficiency of Mr. Rice's punishment was harmless.

---

[1] The government indicated in its brief that the motions court's reliance on the sufficiency of punishment was likely harmless error; however, at oral argument, the government clarified that it did not intend to concede error but that its brief contained a "drafting error" that overstated its position: "In the analysis—in the actual argument—that [sic] the government does later on in the brief, we do get into how it would not be error for the court to consider these general principles underlying the interest of justice. . . . It should be—*may* be—erroneous."

## I.    Factual Background and Procedural History

### A. The Underlying Offenses and Sentencing

Between June 4 and July 9, 2006, twenty-two-year-old Mr. Rice and a group of coconspirators, including twenty-five-year-old Kristopher Piper, committed seven armed robberies in the District. In each incident, Mr. Rice, Mr. Piper, and their coconspirators approached one or more victims in the street and robbed them of their wallets, phones, and other personal belongings while armed with an object that resembled a gun. This spree ended on July 9, 2006, when Mr. Rice and Mr. Piper were arrested and detained without bond following their final robbery. The July 9 robbery was also the first that ended in the death of a victim.

During the final robbery, at approximately 2:30 a.m. on July 9, Tybee Kiedjan and Alan Senitt were returning to Ms. Kiedjan's home on the 3100 block of Q Street NW. Mr. Rice, Mr. Piper, and a third coconspirator approached them, with Mr. Piper armed with a pellet gun painted to resemble a handgun and Mr. Rice armed with a knife, which he had purchased using a stolen credit card from a previous victim. Upon reaching the pair, Mr. Piper forced Ms. Kiedjan to the ground and demanded that she give him her purse and necklace, while Mr. Rice forced Mr. Senitt to the ground a few feet away. Mr. Piper then put his hands inside Ms. Kiedjan's bra and the back of her pants, and she cried out that she was about to be raped. Mr. Senitt,

still on the ground, turned in her direction, and Mr. Rice stabbed him in the back five times and slit his throat. Mr. Rice, Mr. Piper, and the third coconspirator fled in a get-away car driven by another coconspirator. Mr. Senitt died from the wounds inflicted by Mr. Rice.

D.C. Metropolitan Police conducted a subsequent homicide investigation, which revealed that Mr. Rice, Mr. Piper, and the two coconspirators had gone to the Q Street area for the purpose of robbing someone, and that prior to the robbery, Mr. Rice had told his coconspirators that he was "going to stab or cut somebody." When police arrived at Mr. Rice's apartment, Mr. Rice was wearing a blood-stained shirt and was stuffing items taken from Ms. Kiedjan and Mr. Senitt into his pocket while attempting to flee the apartment. Drug test results revealed that Mr. Rice had been using PCP. Following his arrest, Mr. Rice waived his Miranda rights and initially denied any involvement in the crimes but then confessed to participating in the robbery—although he claimed that Mr. Piper had been the one to stab Mr. Senitt.

Both Mr. Rice and Mr. Piper eventually pled guilty—Mr. Rice to second-degree murder while armed, four counts of robbery, and two counts of possession of a firearm during the commission of a crime of violence (PFCV); and Mr. Piper to second-degree murder while armed (felony murder), four counts of robbery, and third-degree sexual abuse. Judge Neal E. Kravitz sentenced Mr. Rice to serve a total of fifty-two years in prison, followed by five years of supervised release, and

Mr. Piper to serve a total of thirty-seven years in prison, followed by five years of supervised release. Mr. Rice's sentence consisted of twenty-five years for the murder charge, sixteen years for the robbery charges, and eleven years for the firearm charges. Following sentencing, Mr. Rice had a projected release date in 2051, and Mr. Piper had a projected release date in 2038. Mr. Piper unsuccessfully moved at various times for early release—efforts that were vehemently opposed by victims and their friends and family.

### B. Mr. Rice's IRAA Motion and Order

In 2024, after serving approximately eighteen years of his fifty-two-year sentence, Mr. Rice moved under the IRAA for a sentence reduction and immediate release. He argued that his maturity, rehabilitation, and fitness to reenter society favored his immediate release. His motion highlighted his traumatic childhood, the context of his PCP use during his criminal behavior, his minimal disciplinary history in prison, his current sobriety and remorse, and his comprehensive reentry plan and support of family and friends. The government opposed the motion, arguing that Mr. Rice could not demonstrate his current non-dangerousness and that the interests of justice did not warrant relief due to Mr. Rice's singular role in the murder, his premeditation—specifically his statements prior to the murder that he "wanted to cut somebody," his past criminal history and failures under supervision, his

underwhelming programming background while incarcerated, and the effect of Mr. Rice's actions on Mr. Senitt's friends and family, including his mother, and Mr. Rice's other victims. The government also noted, under its factor nine discussion, which concerns the extent of the defendant's role in the offense, D.C. Code § 24-403.03(c), that at Mr. Rice's sentencing the court had emphasized that it was "impos[ing] a sentence at the top of the voluntary sentencing guidelines range for Mr. Rice and a significantly more severe sentence than [was] imposed for Mr. Piper" because "the information before the Court makes clear that Mr. Rice acted largely on his own in killing Mr. [Senitt]."

Following two hearings on the motion, during which the court heard testimony from Mr. Rice; Karen Senitt, Mr. Senitt's mother; and Dr. Laeli S. Wilson, a clinical psychologist who examined Mr. Rice to determine his likelihood for violent recidivism, the court concluded that Mr. Rice was entitled to a reduction of sentence under the IRAA but not a reduction that would result in his immediate release.

In coming to these conclusions, the court considered information provided by the parties under the eleven IRAA factors and found by a preponderance of the evidence that "Mr. Rice does not presently pose a danger to the safety of any other person or the community[,]" based on his "near-perfect disciplinary record in prison," his completion of "important rehabilitative courses in areas related to the

underlying causes of his criminal conduct," his maintaining "steady employment for many years in prison," his demonstrated skills in "deescalating stressful and potentially violent situations," his "strong reentry plan and community support mechanisms," and the expert testimony of Dr. Wilson in support of Mr. Rice's claim of present non-dangerousness. The court also found by a preponderance of the evidence that a reduction of his sentence was in the interests of justice given Mr. Rice's showing of non-dangerousness after over eighteen years in prison and the overarching purposes of the IRAA. However, the court drew the line at Mr. Rice's immediate release, which it concluded would "cause a significant and unwarranted disproportionality with Mr. Piper's much longer sentence and would impose insufficient punishment on Mr. Rice." Instead, the court determined that reducing Mr. Rice's sentence from fifty-two years to thirty-seven years—which was "equal to the sentence Mr. Piper is serving"—would be the "most appropriate resolution" because it would maintain "an appropriate degree of proportionality and a sufficient level of punishment."[2] In terms of projected dates of release, this altered Mr. Rice's anticipated prison sentence to end in 2038, as opposed to 2051.

---

[2] While the court acknowledged that Mr. Piper was the ringleader of the robberies, the court made a factual finding that the mere presence of Mr. Piper did not mitigate Mr. Rice's culpability in the murder, such that factor nine weighed against his sentence reduction. This finding echoes the court's comments in the IRAA hearing, recollecting Mr. Rice's original sentencing in 2007:

## II.     Discussion

## A.     Standard of Review

"This court reviews the denial of an IRAA motion for abuse of discretion, but considers questions of statutory construction de novo." *Davidson v. United States*, 349 A.3d 709, 714 (D.C. 2026) (citation modified) (quoting *Doe v. United* States, 333 A.3d 893, 898 (D.C. 2025)). In reviewing for abuse of discretion, this court will "determine whether the decision maker failed to consider a relevant factor, whether the decision maker relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Id.* at 714-15 (citation modified) (quoting *Doe*, 333 A.3d at 898). But even where this court finds that the trial court was "'guided by erroneous legal conclusions' . . . 'we may find that the fact of error in the trial court's determination caused no significant prejudice and hold, therefore, that reversal is not required.'" *Doe*, 333 A.3d at 898 (first quoting *Welch v. United States*,

---

> I know that I viewed Mr. Rice as deserving of greater punishment ultimately than Mr. Piper. And I sentenced Mr. Rice to a total of [fifty-two] years in prison and Mr. Piper to a total of [thirty-seven] years in prison. . . . . [I]t was Mr. Rice who the evidence showed . . . was the one who actually killed Mr. Senitt and did so effectively on his own, even though it was in the . . . course of the felony that both defendants were committing together.

319 A.3d 971, 975 (D.C. 2024); and then quoting *Stone v. Alexander*, 6 A.3d 847, 851 (D.C. 2010)).

## B.     The IRAA Statutory Structure

The D.C. Council enacted the IRAA in 2016 to "ensure that all juvenile offenders serving lengthy prison terms have a realistic, meaningful opportunity to obtain release based on their diminished culpability and their maturation and rehabilitation." *Doe*, 333 A.3d at 898 (citation modified) (quoting *Williams v. United States*, 205 A.3d 837, 846 (D.C. 2019)). Pursuant to the IRAA, a trial court "shall reduce a term of imprisonment imposed upon a defendant for an offense committed before the defendant's 25th birthday" if: (1) certain threshold requirements, including the length of time served, are met, and (2) after considering eleven factors, the court finds that "the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification." D.C. Code § 24-403.03(a); *see also Doe*, 333 A.3d at 899. The eleven factors that the court "shall consider" are:

> (1)    The defendant's age at the time of the offense;
>
> (2)    The history and characteristics of the defendant;
>
> (3)    Whether the defendant has substantially complied with the rules of the institution to which the defendant has been confined, and whether the defendant has completed

any educational, vocational, or other program, where available;

(4) Any report or recommendation received from the United States Attorney;

(5) Whether the defendant has demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction;

(6) Any statement, provided orally or in writing, provided pursuant to § 23-1904 or 18 U.S.C. § 3771 by a victim of the offense for which the defendant is imprisoned, or by a family member of the victim if the victim is deceased;

(7) Any reports of physical, mental, or psychiatric examinations of the defendant conducted by licensed health care professionals;

(8) The defendant's family and community circumstances at the time of the offense, including any history of abuse, trauma, or involvement in the child welfare system;

(9) The extent of the defendant's role in the offense and whether and to what extent another person was involved in the offense;

(10) The diminished culpability of juveniles and persons under age 25, as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime, and the defendant's personal circumstances that support an aging out of crime; and

(11) Any other information the court deems relevant to its decision.

D.C. Code § 24-403.03(c).

For an IRAA motion, "the burden of proof is on the movant." *Davidson*, 349 A.3d at 715 (citation modified) (quoting *Doe*, 333 A.3d at 900). "Notably, the Council amended the IRAA in 2019 to remove 'the nature of the offense' as a standalone consideration under factor two; however, the Council emphasized that courts still 'consider the facts and circumstances surrounding the underlying offense through their review of the various factors and evidence.'" *Id.* at 715-16 (quoting Report on Bill No. 23-0127 before the Committee on the Judiciary and Public Safety, Council of the District of Columbia, at 18-19 (Nov. 23, 2020)); *see also Doe*, 333 A.3d at 906-11.

## C.     Codefendant Sentencing Disparity

Mr. Rice first argues that the motions court's consideration of the potential for sentencing disparity between himself and Mr. Piper was an abuse of discretion under the IRAA. He argues that such consideration: (1) "inappropriately second-guessed and usurped" the D.C. Council's setting of the IRAA's eligibility period to under twenty-five years of age; (2) led to an unreasonable conclusion that the resulting disparity was "unwarranted" given the other differences, besides age, between

Mr. Rice and Mr. Piper[3]; and (3) erased any meaningful opportunity for Mr. Rice's immediate release because it based his eligibility for relief on a static factor outside of his control, i.e., the sentence being served by his codefendant. Mr. Rice also argues that—although not explicitly stated in the order—Judge Kravitz's focus on sentence disparity in fact arose from his improper reliance on distinct sentencing statutes, like the federal sentencing statute, in which codefendant sentencing disparity is a consideration. This, according to Mr. Rice, demonstrates that the judge's "fixation on avoiding a disparity with Mr. Piper's IRAA-ineligible sentence" in its evaluation of Mr. Rice was directly counter to the IRAA's purpose as articulated by the D.C. Council and clarified in our prior cases.

The government in turn argues that the court properly considered all eleven statutorily-mandated factors based on the record, and that its consideration of the original sentence of Mr. Rice's codefendant was an "appropriate metric" for the court to utilize to measure Mr. Rice's diminished culpability under the IRAA in light of his age and to account for the original fifteen-year disparity between their sentences, with Mr. Rice receiving the longer of the two sentences. In effect, the

---

[3] As Mr. Rice points out, Mr. Rice and Mr. Piper are not identically situated but for Mr. Rice's greater culpability in the murder. While the two men participated in the same underlying crimes, Mr. Piper was the indisputable ringleader of the robberies (but not the murder), had a more serious prior record than Mr. Rice, committed sexual abuse against Ms. Kiedjan, and is slightly less than three years older than Mr. Rice.

government argues that the court's consideration of the original sentencing disparity between the two men was conducted as part of its broader analysis under the interests of justice prong, including in response to difficult questions of how Mr. Rice's sole culpability in the more serious crime—the murder of Mr. Senitt—interplayed with statements of Mr. Senitt's friends and family who vehemently opposed any early release and instead alleged that he should have received a longer sentence in the first place. Indeed, the court referenced the "profoundly negative and lasting effects those crimes have had on the victims and their families," under its factor six analysis and noted that it was "deeply moved by their statements."

Consideration of a sentencing disparity between codefendants is not explicitly barred under the broad discretion permitted under factor eleven's call for "[a]ny other information the court deems relevant to its decision." D.C. Code § 24-403.03(c)(11). However, we have had several occasions to consider the effect of "reli[ance] upon an improper factor" in a motions court's IRAA analysis—factors that were also not barred by the express dictates of the statute. *See Riley v. United States*, 338 A.3d 1, 6 (D.C. 2025). For instance, in *Doe v. United States*, we held that the trial court had both improperly relied on the seriousness of Mr. Doe's underlying offenses as a standalone factor and erroneously applied an unrelated statute and an inapplicable legal framework to resentence Mr. Doe. 333 A.3d at 896-97. Despite these errors, we affirmed the trial court's denial after concluding that the errors did

not cause substantial prejudice given the existence of factors weighing against immediate release, namely, the victim impact statements and the extent of Mr. Doe's role in the offense. *Id.* at 912.

Following *Doe*, we similarly held in *Riley v. United States* that it was error for the trial court to rely on the District's determinate sentencing statute and sentencing guidelines when conducting its interests of justice analysis because these factors fall outside of the IRAA's enumerated factors. 338 A.3d at 3, 5-6. Indeed, although the trial court found "that most IRAA factors weighed in Riley's favor and that Riley was not presently dangerous," we held that the trial court erred in "look[ing] exclusively to other authorities to inform its 'interests of justice' calculus—like the District's determinate sentencing statute—rather than the IRAA factors themselves." *Id.* at 9. However, unlike in *Doe*, we vacated and remanded for reconsideration in *Riley* because the government did not dispute that the errors were harmful. *Id.* at 10.

Similarly, in *Bishop v. United States*, we concluded that "in relying on an outdated version of the [IRAA], the trial court 'failed to undertake a required factual inquiry'" in its analysis under factor ten's "diminished culpability" consideration. 310 A.3d 629, 643 (D.C. 2024) (quoting *Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979)). We remanded in *Bishop* because the trial court had "both cited outdated statutory language *and* neglected to discuss the considerations reflected in the current version of the statute." *Id.* at 644 (emphasis added).

Collectively, *Doe*, *Riley*, and *Bishop* bar the court from looking at statutes and legal frameworks outside of the current version of the IRAA when conducting their analyses and resentencing determinations, but they do not directly speak to a court's consideration of other facts that it finds relevant under factor eleven that are not directly linked to a court's reliance on external sources of law. Moreover, in *Doe* we explicitly *declined* to "provide a rigid definition of the interests of justice—or a rigid rule that mandates how a trial court must weigh the enumerated factors," instead stating that "a trial court must exercise its discretion to determine whether the interests of justice warrant a sentence reduction by applying and weighing the considerations set forth in the enumerated factors." 333 A.3d at 911 (citation modified) (citing *Welch*, 319 A.3d at 975).

Mr. Rice urges us to view any consideration of sentencing disparity as prohibited under a broader reading of *Doe* and *Riley*, which would not only prohibit a court from consulting statutes and guidelines outside of the IRAA, but would also prohibit consideration of *any* facts outside of those specifically enumerated under the IRAA factors—regardless of source and regardless of the judge's determination of relevance. But not only do we reject this interpretation of the permissible analysis available and required under factor eleven, we view codefendant sentencing disparity as an existing consideration contemplated by the IRAA under factor nine, which requires a court to consider the movant's role in the offense and the extent to

which another person may have been involved in the offense. D.C. Code § 24-403.03(c)(9). We also reject Mr. Rice's argument that factor nine must categorically weigh in favor of the movant in light of our prior holdings. *See, e.g.*, *Jackson v. United States*, 346 A.3d 656, 663 (D.C. 2025) (holding that the motions court had properly found that the movant had a substantial role in the murder and had permissibly weighed factor nine against the movant's request for early release).

This issue is related to and yet distinct from the question of a court's consideration of the seriousness of the underlying offense in an IRAA motion. Following the D.C. Council's removal of language specifically instructing courts to consider the nature of the offense under factor three of the IRAA after "express[ing] concern with an 'over-reliance on the underlying offense' as a reason for 'denying petitions of potentially rehabilitated defendants,'" we held that such removal did not mean that consideration of the nature of the offense was no longer permissible under the IRAA. *Bishop*, 310 A.3d at 649. Rather, we recognized that IRAA courts will necessarily need to consider the seriousness of the movant's offense under several IRAA factors that "directly relate to the nature and seriousness of the underlying offense, including victim impact statements and the extent of the defendant's role in the offense." *Doe*, 333 A.3d at 908. We explained that "[t]he issue [wa]s . . . not *whether* a court may consider the nature and seriousness of the offense, but rather

*how* a court may do so" in emphasizing that this issue cannot be the end-all-be-all of the analysis. *Id.*

Instead of outright barring a trial judge's consideration of a relevant topic, we have clarified that a court must make an individualized assessment of a movant's application under the IRAA, relying on the eleven factors for source material. *See Bishop*, 310 A.3d at 636 (describing the focus of the IRAA according to the D.C. Council as "individualized" and intended to "take into account the idiosyncratic characteristics of the movant, both at the time . . . [of] the offense and . . . the motion" (citation modified)). We have also discussed the need for a balanced assessment of the IRAA factors that does not emphasize a single factor to the exclusion of others. *See Doe*, 333 A.3d at 909-10. We also note that the dangerousness prong and the interests of justice prong are separate analyses that rely on the specific facts elucidated under the eleven factors. *See* D.C. Code § 24-403.03(a)(2) (the court must find "after considering the factors set forth in subsection (c) of this section, that the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification"). In determining a movant's current dangerousness, a court will necessarily look at a movant's demonstrated maturity and personal development at the time of the motion. *See Doe*, 333 A.3d at 910 (identifying the maturity and rehabilitation consideration under factor five as "clearly relat[ing] to dangerousness"). In determining whether the interests of justice

support sentence modification, a court will look at the impact such modification would have on the larger society, including any victims of the movant. *See id.* at 911 (identifying victim impact statements under factor six as "clearly relat[ing] to the interests of justice"). While the eleven factors are utilized in both analyses, some may play a greater role in one prong's analysis than the other. Given these distinctions, a finding of non-dangerousness does not necessarily require that a court also find that the interests of justice weigh in favor of sentence modification, and vice versa, otherwise the two analyses would be identical and redundant.

In this case, the court's finding that the interests of justice did not weigh in favor of sentence modification was supported by the government's recommendation that relief be denied, under factor four, by the statements of Mr. Rice's victims who spoke of their ongoing trauma and advocated for his continued incarceration, under factor six, and by the court's findings regarding Mr. Rice's particular role in the underlying offenses, under factor nine, namely, his sole culpability in the murder of Mr. Senitt. In this overall context of the court's individualized assessment utilizing the eleven IRAA factors, we cannot say that the analysis was inappropriately wedded to codefendant sentencing disparity, such that but for the existence of a less culpable codefendant, the court would have determined that the interests of justice weighed in favor of Mr. Rice's immediate release. Under the interests of justice prong, the court's consideration of Mr. Rice's greater culpability was appropriate because it

was relevant to the court's inquiry into the effect his sentence modification would have on people beyond Mr. Rice himself. The court considered that just under half of Mr. Rice's original sentence—twenty-five out of fifty-two years—derived from the second-degree murder charge, which accounted for his original sentence being longer than that of his coconspirator, who was the "ringleader" in the armed robberies. Accordingly, the court weighed the fervent opposition to his release by the individuals most affected by this offense—Mr. Senitt's friends and family— against Mr. Rice's immediate release, even though the court had determined that some relief in the form of sentence modification was appropriate.

Mr. Rice argues that the court viewed the amount of time remaining in the sentence of Mr. Piper as a "floor," capping the relief available for his own resentencing; the government, meanwhile, argues that the court looked at the original sentencing disparity as a "guidepost," or a "starting point" to consider how much time was appropriate by which to reduce Mr. Rice's sentence. We do not view the court's consideration of codefendant sentencing as a foregone conclusion that, but for the existence of a less culpable codefendant, the court would have decided Mr. Rice's IRAA motion differently. Given the court's evident consideration of other factors that weighed against Mr. Rice's immediate release and the permissibility of a court to consider codefendant sentencing under factors nine and eleven of the IRAA, we hold that the court did not abuse its discretion in finding that

Mr. Rice was eligible for a sentence reduction of fifteen years, but that the interests of justice did not support his immediate release.

### D.     Consideration of the Sufficiency of Mr. Rice's Punishment

Mr. Rice also argues that it was error for the court to consider the sufficiency of his punishment as a factor in its interests of justice analysis. In Mr. Rice's view, just as we "prohibited [courts] from considering the seriousness of the defendant's underlying offenses in isolation and outside of the framework of the enumerated factors[]"—including "pursuant to the catch-all provision" of factor eleven, so have we explicitly prohibited consideration of the sufficiency of a movant's punishment in an IRAA analysis. *Doe*, 333 A.3d at 906-08; *see Riley*, 338 A.3d at 9-10. Mr. Rice argues that this error was not harmless because it was one of only two reasons that his request for immediate release was denied.

In *Riley*, we held that the court erred by relying on both the seriousness of the offense and the need for "just punishment" when resentencing Mr. Riley and concluded that "just punishment" is "not a salient IRAA consideration because IRAA's 'very terms provide a framework for a significant reduction of a sentence that, according to the initial sentencing judge, fit the serious, heinous nature of the crime.'" 338 A.3d at 9-10 (citation modified) (quoting *Doe*, 333 A.3d at 907). Relatedly, in *Walls v. United States*, where the court's "sole articulated basis for

rejecting" an IRAA motion was its belief that the movant "would benefit from more time and support in prison," we held that "[t]he non-dangerous who have otherwise checked IRAA's boxes cannot be further imprisoned because, in a trial judge's view, they would benefit from further imprisonment." 340 A.3d 22, 24 (D.C. 2025) (second citation modified).

As we have stated in the past, the text and history of the IRAA clearly indicate that the D.C. Council wanted courts to "look away from statutes containing mandatory minima and to focus on the merits criteria contained within IRAA." *Riley*, 338 A.3d at 10. As such, a court's reliance on the sufficiency of the movant's punishment as a basis for denying relief inappropriately inserts factors outside of those enumerated in the IRAA into the analysis. *Id.* at 9. However, even assuming that the court's consideration of the sufficiency of Mr. Rice's punishment was in error, we hold that it was not an abuse of discretion requiring reversal because it did not cause "significant prejudice" in light of the existence of other factors that weighed against immediate release. *See Doe*, 333 A.3d at 912 (quoting *Johnson*, 398 A.2d at 366).

Mr. Rice incorrectly posits that codefendant disparity and sufficiency of his punishment are "the only reasons" the trial court denied his request for immediate release and asks us to ignore the other factors that the court weighed against his release because the court did not explicitly re-raise them in its interests of justice

analysis section. To follow that logic, we would have to credit his contention that as "one would expect to see those factors cited in [the interests of justice] section of the trial court's order . . . [b]ut they are absent," the court must *not* have relied on them and would have reached a different result if not for the errors. Notably, Mr. Rice does not argue that the motions court erred earlier in its order where it found that the victim impact statements, the government's opposition to the motion, and Mr. Rice's role in the murder weighed against his release; rather, he urges this court to consider that these are only three out of ten factors and that the remaining factors should (and would) have tipped the scale in his favor if not for the court's errors.

But we have clarified that "a trial court's decision not to robustly discuss every piece of evidence under each relevant factor might not, by itself, warrant reversal," *Bishop*, 310 A.3d at 644, and we have explicitly declined to provide courts with "a rigid rule that mandates how a trial court must weigh the enumerated factors[,]" finding that to do so would "be inconsistent with the statutory framework," *Doe*, 333 A.3d at 911. The order's abbreviated "Discussion" section notwithstanding, we read the record as demonstrating the court's careful consideration of the eleven IRAA factors, which informed its analysis of Mr. Rice's motion. Specifically, the court indicated in its factor six analysis that it was "deeply moved" by the many victim impact statements of victims, friends, and family, and noted that Mr. Senitt's murder has had a "profoundly negative impact" on his family and community, including

their "having to revisit the events of his death" in their participation in the IRAA process.[4] The court also acknowledged, under factor nine (and passingly, under factor eleven), the "undisputed" fact that Mr. Rice committed the murder of Mr. Senitt on his own, resulting in his longer original sentence. Finally, the recommendation of the government that Mr. Rice not be granted early release was duly noted under factor four. Despite these factors weighing against relief, the court still reduced Mr. Rice's sentence by fifteen years, making him eligible for release in 2038, at which time he will be fifty-four years old.

On this record, we view the court's analysis as similar to that in *Doe*, and we conclude that there is no indication that the court would have reached a different result had it not considered the sufficiency of his punishment. *See Doe*, 333 A.3d at 912 (holding that there was no significant prejudice to the IRAA movant where the court also found that the serious and severe impact on the victims and the extent of the defendant's role in the offense weighed against his relief). Therefore, we hold that Mr. Rice was not substantially prejudiced by the court's erroneous exercise of

---

[4] Further, the court's consideration of the sufficiency of the punishment in its factor eleven analysis was partially rooted in the "profoundly negative and lasting effects those crimes have had on the victims and their families," as reviewed more fully under factor six. This is distinct from the *Riley* motions court's focus on District sentencing laws in its consideration of sufficiency of the movant's punishment. 338 A.3d at 10.

discretion in considering the sufficiency of his punishment when it determined that his sentence should be reduced by fifteen years.

### III.      Conclusion

For the reasons set forth above, the judgment of the Superior Court is affirmed.

*So ordered.*